# Walker *v.* Tillis.

### *Trespass and Trover.*

(Decided June 30, 1914.  66 South. 54.)

1. *Trespass; Party Entitled to Sue.*—One not in possession nor
entitled to possession cannot maintain trespass quare clausem for
the wrongful removal of fixtures placed on real estate by a lessee
and his sub-lessee.

2. *Landlord and Tenant; Removal of Structure; Liability.*—Where
the owner of practically all the stock of a traction company, which
held as sub-lessee, an amusement park, directed the manager to
remove fixtures, but not to remove or disturb any of the buildings,
and did not give any directions for the removal of a track in the
park, he was not liable for the act of the manager in removing or
disturbing the buildings, and in removing the tracks, and his mere
knowledge of the removal of the track was not sufficient to render
him liable personally.

3. *Fixtures; Removal; Action; Waste.*—An action in the nature of
waste lies for the wrongful removal of fixtures by a tenant which
results in injury to the reversion, and the landlord may apply for
an injunction before the removal.

4. *Same; Right of Lessee.*—In the absence of any provision in the
lease to the contrary a sub-lessee of an amusement park may remove
amusement devices erected by it, if removable without serious injury
to the freehold, and made during the term.

5. *Same; Lease; Construction; Trade Fixtures.*—A provision in the
lease of an amusement park that after the expiration of the term
the lessor may repossess himself, and that all improvements erected
on the land during the lease shall revert to him, and that the land
with improvements shall revert within thirty days after non-payment

of rent at maturity, the failure to perform other conditions on giving notice will not authorize the lessor to prevent the removal by the lessee or the sub-lessee of trade fixtures; the word "improvement" being confined to alterations, repairs, or improvements on the premises not including articles in their nature, chattels.

6. *Same; Trade Fixtures.*—Mere machines or trade fixtures in the nature of chattels, capable of being detached without material injury to the freehold, may be removed by the lessee or his sub-lessee during the term; the machines or trade fixtures having been erected by the lessee or his sub-lessee as fixtures.

APPEAL from Montgomery City Court.

Heard before Hon. ARMSTEAD BROWN.

Action in trespass and in trover by Bessie W. Walker against Richard Tillis. From a judgment for defendant, plaintiff appeals. Affirmed.

The following is the lease contract referred to as attached to the complaint:

This agreement made and entered into this 10th day of June, 1912, by and between Bessie W. Walker and Hal T. Walker of the city of Montgomery, parties of the first part, and Frances E. Ayres of the same place, party of the second part, witnesseth: That the said parties of the first part have this day leased to the party of the second part for a term of twenty years said lease commencing on January 1, 1902, and ending on December 31, 1921, 81 acres of land owned or controlled by said first parties [here follows description of the land] conditioned as follows: (1) That the party of the second part shall only cut down from said land such shrubbery or forest timber under 4 inches in diameter as he, in his judgment, may wish to cut for the purpose of beautifying said land for park purposes, and all timber cut, together with all dead timber now on said land, and all such timber as may have been cut on said land before the signing of this lease by the party of the second part, shall remain the property of the said party of the first part, and said parties of the first

parts, their agents or attorney, shall have free access to the park for the purpose of removing same at any time. (2) Said land shall be used only for park purposes and a pleasure resort during the life of this lease. (3) At the expiration of this lease, the second party agrees that the said first parties shall have the right to enter into and upon said land, and repossess themselves thereof, and all improvements of whatever kind and nature erected upon said land during the life of this lease shall revert to the first parties hereto and become their property in fee simple without process of law. (4) That for and in consideration of said lease for said lands the second party hereby binds himself, his executors, administrators, and assigns, to pay to the first parties the sum of $400 per annum, payable quarterly, as rent for said land, and has executed his several promissory notes therefor. (5) That in case of failure upon the part of the second party hereto to pay said rent when the same becomes due within 30 days thereafter, or to perform any of the other conditions or stipulations of this lease after having been given 10 days written notice of his failure to do so by the said parties of the first part, then the land and all the improvements thereon at the option of first parties shall revert to and become the property of the said first parties. (6) Nothing in this lease shall be so construed as to prevent the parties of the first part from granting a right of way by deed or lease through any part of said leased land for street railway purposes.

W. A. GUNTER, and A. A. EVANS, for appellant. Tillis came in under Ayers, who rented from Walker, and hence, could not dispute the title. Plaintiff proved her case fully, leaving open only the dispute whether or not the articles could be regarded as improvements of some

kind or other, which were erected and placed upon the demised premises. That they were improvements within the term of the lease, see 1 Atl. 623; 16 How. 220; 29 Barb. 363; 2 M. & G. 727; 47 N. Y. Supp. 1102; 18 Com. Bench, 893; 137 N. Y. 163; 13 Atl. 523; 74 Tex. 605; 97 Mass. 279; 1 J. & H. 436; 2 H. & C. 777; L. R. 1 K. B. 87; 7 Port. 106; *Johnson v. E. M. & T. Co.,* 129 Ala. 515; *Broadus v. Smith,* 121 Ala. 335. The covenant is to be construed most strongly against the covenantor.—*Nelson v. Manning,* 53 Ala. 549; *Chambers v. Ringstaff,* 69 Ala. 140.

RAY RUSHTON and M. W. WILLIAMS, for appellee. The articles removed were fixtures and not improvements, within the terms of the lease.—19 Cyc. 1047, 1058, 1061, 1062; 84 Am. St. Rep. 884. Before the expiration of a lease the tenant may remove improvements made by him in aid of his trade, or for ornament or more convenient use of the premises.—19 Cyc. 1065; 55 Fed. 229; 44 Atl. 1024; 102 Mass. 201; 142 U. S. 396; 4 Lea 333; 48 Pac. 172; 116 Mass. 155. The traction company would not have lost its property even if it had entered upon the lands without any contract whatever.—*Jones v. N. O. & S. R. R. Co.,* 70 Ala. 227. For a proper construction of the contract, see *Hill v. Townsend,* 69 Ala. 287.

MAYFIELD, J.—Appellant sued appellee in trespass and in trover, claiming $50,000 damages for that the defendant willfully and maliciously tore down and carried away improvements consisting of houses and parts of houses and fixtures and other improvements attached to, and forming parts of, realty belonging to the plaintiff; the count in trover adding that the plaintiff had converted the same to his own use.

Count 1 was in trespass, and claimed $10,000 as actual damages for value of the structures torn down, and $40,000 as punitive damages for malicious inujry and destruction of the property.

The second count claimed damages only for a willful and malicious trespass committed upon the plaintiff's freehold by the demolishing and tearing down of the property, and the removal of the same.

The third count was in trover for conversion of the fixtures and improvements after they were severed from the freehold.

The fourth count claimed damages merely for the malicious tearing down and removal of the property mentioned, which was a part of and attached to the realty.

The fifth count was like the fourth, but added that the wrongful act of the defendant was an injury to the freehold.

Counts 1 and 4, by appropriate averments, refer to, and attach as exhibits thereto, a certain lease contract made by the plaintiff with one Frances E. Ayres, which contract the reporter will set out in full. This contract was subsequently assigned by Ayres to the defendant, Tillis, who subsequently transferred his interest in the premises to the Montgomery Amusement Company, which company used the premises for two or three years as an amusement park. The stock of said company was subsequently acquired by another corporation, the Montgomery Street Railway Company, which was thereafter consolidated with the Montgomery Traction Company, and this last-named corporation operated the park until the spring of 1909. The wrongs and injuries hereinafter complained of occurred during the month of July, 1909.

At the time of the original lease by the plaintiff to Ayres the lands consisted mainly of swamp and wood-

lands, which were later developed into a pleasure resort.

Prior to the spring of 1909 "there were built on the premises, by the tenants, the following buildings: A dining hall, a street railway station, a theater, a dancing pavilion, a skating rink, barbecue pits, a billiard room, and a bowling alley building. There were also installed at the said park, by the tenants, several devices used solely for the amusement and entertainment of the visitors and patrons of the park. They were commonly known as 'amusement devices,' and among them were the following: A 'merry-go-round,' a 'roller coaster,' a 'Hale's touring car,' a 'revolving swing,' and a 'bowling alley.'"

This park and pleasure resort was connected on the southwest with the city of Montgomery by a street electric railroad, touching it on the southwest corner, operated by the said Montgomery Street Railroad Company, owned in whole or in larger part by the said Richard Tillis.

There was evidence to show that afterwards a rival electric railroad company was organized and operated against the said Montgomery Street Railroad Company. This company obtained from the plaintiff a right of way for an electric railroad into said park, as shown by a deed executed by the plaintiff and her husband to the said traction company.

The only connection that the defendant is shown to have had with the amusement park, or with the wrongs and injuries complained of, is that he purchased the interest of Ayres in the lease, and subsequently assigned it to the amusement company, which was absorbed by the Montgomery Street Railroad Company, which, in turn, was consolidated with the Montgomery Traction Company, and that the defendant, Tillis, owned practi-

cally all the stock of the new corporation, and that after the consolidation of the two companies, and until the spring of 1909, the park was operated by the Montgomery Traction Company.

During the spring of 1909, the patronage of the park having almost ceased on account of mosquitoes and malaria at the park, the defendant, Tillis, had a conversation with Ginnivan, the manager of the traction company, in which conversation Tillis stated to Ginnivan that he (Tillis) thought it would be better to discontinue Electric Park and build up Pickett Springs, another pleasure resort of the Montgomery Traction Company, and for him to go to work to accomplish that end. Tillis told Ginnivan that he had better remove the different devices out there, but not to remove any of the buildings or disturb them. Tillis did not tell Ginnivan anything about the railroad track, but knew that he did move it; nor were any orders given by Tillis to any one else to remove the track. There was nothing said about moving the track at that particular time. Tillis stated in his testimony that the track was used "when we needed the rails, from time to time, from early in the spring up to June, after the devices were taken away."

During the spring of 1909, prior to July 1st, Ginnivan, the manager of the traction company, tore down and carried away a "merry-go-round," and also an iron structure supported upon concrete foundations to which the merry-go-round was fixed by iron bolts and nuts. The merry-go-round was operated by a motor fastened to the foundation in such way that it could be taken loose. The electric current for operating it was brought by wires from the city of Montgomery, and connected by an arrangement above the merry-go-round. The merry-go-round was made in sections which could be

easily adjusted and fastened to the concrete foundation, which was not removed. Ginnivan carried away a picket fence inclosing a swing which was one of the amusement devices; and he took down and removed the swing, a steel structure 40 feet high, supported upon a concrete foundation and attached by means of rods and nuts. Said swing was also put up in such manner that it could be removed when desired. Manager Ginnivan also removed the end of a shed in which was a device called "Hale's touring car," in order to take out the car. The shed was made of wood and canvass, without flooring, and was built especially to inclose this car. Ginnivan also tore down and carried away a "roller coaster," which was a structure 80x175 feet, consisting of posts firmly framed together, some 20 feet high; part of it was a train track for running small cars in which persons could be seated, the cars being attached to a cable by which they were lifted or made to rise to the highpoints, and then, being freed from it, were carried along the track by gravity and momentum, down and up grade, around and through the structure, back to the starting point. The machinery operating the cars was connected with electric motors which drew the cars up the first ascent by cable. Ginnivan removed a bowling alley used in the game of ten pins, and manufactured in sections and so put down as to be easily moved. None of the flooring of the alley was removed, so far as the evidence shows. The manager took away about 750 feet of electric railway including posts and fixtures, located upon the land in question.

The defendant, being put upon the stand as a witness in his own behalf, testified that he bought out the said traction company, and owned practically all of its stock, and that he was familiar with the terms of the said Ayres lease. He also testified, against the objec-

tion of the plaintiff, that Mr. Rushton was president, and also attorney of the traction company, and that in a conversation between him and the said president his recollection was the said president told him that he could remove the structures which he did remove.

A demurrer being sustained to the first count, the trial was had upon the remaining four, and the trial court gave the affirmative charge in favor of the defendant, which, of course, resulted in a judgment in his favor; and from that judgment, the plaintiff prosecutes this appeal.

The only error assigned or insisted upon is the giving of the affirmative charge for the defendant.

Of course there could be no recovery in this case in trespass quare clausum fregit, for the reason that it is admitted that the plaintiff was not in possession, nor entitled to the possession, of the land at the time of the wrongs and injuries complained of, and it should be said that no such contention is made by the appellant; but it is contended by her counsel that she is entitled to recover, either in trespass de bonis asportatis or in trover, as to the fixtures, improvements, or devices which the evidence showed that the manager of the traction company had torn down and carried away under the direction, or with the consent, of the defendant, Tillis.

The remedies of the landlord in a case like this are stated by Mr. Wood (2 Landlord and Tenant, § 531) as follows: "An action on the case in the nature of waste lies for the wrongful removal of fixtures, for such removal amounts to an injury to the reversion, which the law regards as waste; and where the act amounts to a breach of covenant the landlord may sue either in case, or on the covenant, as he prefers. He may also, before the removal, apply to a court of equity for an injunction to prevent the removal. Although a landlord

cannot maintain an action of trespass for entering the premises during the occupation of the tenant, because occupation is necessary to maintain that form of action, yet immediately upon the severance of the fixtures from the realty they become mere chattels, and he may maintain an action of trespass for taking them away, for the property is vested in him from the time of severance; or where the fixtures have been unlawfully severed from the freehold and carried away, or otherwise converted or disposed of, he may maintain trover for their value. In trespass for taking the plaintiff's goods, chattels, and effects, it was held that the value of fixtures might be recovered under those words."

It is certain that there could be no recovery against this defendant, Tillis, as to any buildings or parts of buildings, or for injury thereto, for the reason that the undisputed evidence shows that Tillis expressly directed the manager not to remove or disturb any of the buildings. For the same reason it is certain that there could be no recovery against Tillis as to the removal of the street railway, for no orders were given by him to the manager or to any one else to remove the track, and for the reason that the railway track was placed upon the premises under a different contract from that relied on by the plaintiff in counts 1 and 4; and without this contract and without any evidence connecting Tillis with the removal further than that he owned practically all of the stock of the corporation which owned the street car track which was removed, his mere knowledge of its removal is not sufficient to render him liable personally in either trespass or trover for such removal.

The question is therefore narrowed down to this: Was there any evidence which showed or tended to show that the defendant, Tillis, was liable to the plain-

tiff in trespass or in trover for the acts of Ginnivan in tearing down and removing the amusement devices before mentioned?

Mr. Ewel, in his work on Fixtures (page 1), says: "There is perhaps no other legal term which has been used in so many differing and often contradictory significations as the word 'fixtures.' In the discussion of the subject there has arisen a number of terms expressing more or less explicitly those different significations. Among these terms may be mentioned those of 'tenant's fixtures,' 'landlord's fixtures,' 'removable' and 'irremovable fixtures,' 'trade fixtures,' etc. The question as to whether certain property is a chattel, a 'removable' or 'irremovable fixture,' or a part of the realty is made to depend sometimes upon the degree of the annexation of the chattel to the land, and the intention with which such annexation was made. The term 'fixture' is sometimes used to denote articles of a chattel nature, which, when once annexed to the land, may not be removed by the party annexing, as against the owner of the freehold. In the most general sense of the term it means any annexation or addition which has been affixed to, or planted in, the soil of the land. In other words, the books have sometimes defined the term 'fixture' to include whatever is affixed to, and cannot be removed without injury to, the freehold, and it becomes thereafter a part of it."

But, as was said by this court, in the case of *Rogers v. Prattville Co.,* 81 Ala. 483, 1 South. 643, 60 Am. Rep. 171, no precise rule can be given which will determine in all cases whether any given property is a chattel or a fixture. This "varies with the different relations of parties, and is largely dependent on intention" of the parties as "shown or inferred."

In that case Stone, C. J., said that there are cases which hold that, when a building is constructed for manufacturing purposes, all the machinery and appliances used in connection with the business, whether attached to the realty or not, become a part of it, and adds that our own court has not gone to this extreme length, as with us mere use, in connection with the business, does not so annex machinery to the realty as to constitute it a part thereof. Intention is more or less a factor in such instances. It often depends upon the intention of the party making the annexation. The precise point at which a chattel loses its character as such and becomes a part of the realty, is difficult to define by any fixed rule applicable to all cases.

In the *Rogers Case,* before mentioned, it was held that the mere use of machinery in a mill or factory did not necessarily annex it to the realty so as to constitute it a part thereof.

The rules of law as to fixtures are different when applied between parties occupying different relations; that is, the rules are different as applied to heirs and administrators, vendors and vendees, mortgagors and mortgagees, and landlords and tenants. The rigor of the common-law rule as to fixtures has been relented in favor of the tenant, as between him and the landlord, both in England and in America.

In *Poole's Case,* 1 C. 368, decided in the year 1703, Holt, C. J., held that a tenant who was by trade a soap boiler, and had, for the convenience of his trade, put up vats, copper boilers, partitions, etc., and paved the back yard, had the right during the term of his lease to remove such fixtures. This is probably the first case that put the question of trade fixtures of a tenant upon a clear and satisfactory basis; and the rule was stated to be in favor of trade, and to encourage industry, and has

ever since been regarded as the original ground for the exceptions as to trade fixtures made by tenants.

The American courts have added to this reason given by the English courts one upon which they say the exception is in part founded—that is, the subserviency of public policy; that the intention of the tenant making the annexation was to serve the convenience of his trade, and not to enhance the freehold; that it was the reasonable intention of the tenant to place such trade fixtures upon the land, for the purpose of better enjoying the articles annexed, or of using them in his trade as chattels, and to remove them at his pleasure.

Under this rule it has been long and well settled that mere utensils or machines or trade devices, being themselves of chattel nature, and capable of being detached without material injury to the freehold or to the chattel, and such as can be set up and used elsewhere, may be removed by the tenant or his vendee during the term. Under this rule it has been held that distillery fixtures, such as copper stills, boilers masoned up in brickwork, etc., could be removed.—*Reynolds v. Shuler,* 5 Cow. (N. Y.) 323. The same rule has been held to apply to an iron tank upon a foundation of brickwork and cement (*Cooper v. Johnson,* 143 Mass. 108, 9 N. E. 33) ; to a steam engine erected by a tenant for years or for life, if for trade purposes (*Lawson v. Polaski County,* 3 Ark. 13; *Haskell v. Manlove,* 14 Cal. 59; *Hey v. Bruner,* 61 Pa. 87; *Kelsey v. Durkee,* 33 Barb. [N. Y.] 410) ; to iron rails laid by a tenant in a tunnel in a coal mine (*Heffner v. Lewis,* 73 Pa. 302) ; to casing in an oil well, and a derrick and other appliances used in operating same (*Shellar v. Shivers,* 171 Pa. 569, 33 Atl. 95) ; to a shafthouse and machinery (*Updegraff v. Lesem,* 15 Colo. App. 297, 62 Pac. 342) ; to a steam boiler, though inclosed in brick masonry (*Kelsey v. Durkee,* 33 Barb.

[N. Y.] 410; *Cooper v. Johnson,* 143 Mass. 108, 9 N. E. 33; *Hanks v. Boston & Albany Ry.,* 147 Mass. 497, 18 N. E. 218); to a vault, built on its own foundation, for banking purposes (*Dostal v. McCaddon,* 35 Iowa, 318); and to a safe built therein, too large to be removed without tearing down the vault (*McCall v. Walter,* 71 Ga. 87); to a bowling alley erected by a tenant, including the partitions between the alleys (*Commonwealth v. Morgan,* 107 Mass. 201; *O'Brien v. Kusterer,* 27 Mich. 289); to a corn mill and to machinery running a chair factory (*Lacey v. Giboney,* 36 Mo. 320, 88 Am. Dec. 145); to certain railroad iron, frogs, spikes, bolts, etc. (*Northern Cent. Ry. Co. v. Canton Co. of Baltimore,* 30 Md. 347); and also to a scenic railway and to the foundations of brick piers (*Thompson Ry. Co. v. Young,* 90 Md. 278, 44 Atl. 1024).

There are many other like cases, too numerous to mention, to be found cited in notes to Ewell on Fixtures. The following seems to be a very clear statement of the rule and the exceptions in favor of trade fixtures, and is taken from a note in 84 Am. St. Rep. 884: "The general rule at common law that whatever was annexed to the freehold became a part of it seems always to have been subject to an exception in favor of tenants who placed fixtures on property to be used in connection with trade or manufacturing.—*Perkins v. Swank,* 43 Miss. 349. Such right exists even in the absence of a special contract; no such contract being necessary.—*Yater v. Mullen,* 23 Ind. 562. The right to remove is implied from the circumstances.—*Howard v. Fessenden,* 14 Allen (Mass.) 124. Indeed, the consent of the landlord is not necessary to give the tenant the right to remove trade fixtures.—*Andrews v. Day Co.,* 132 N. Y. 348, 30 N. E. 831. Such fixtures remain the personal property of the tenant without the consent of

o

the landlord. It has even been held that, where the lease provided that the tenant should not remove 'any repairs, improvements, additions, or fixtures,' such provision was not intended to apply to trade fixtures.—*Cubbins v. Ayres,* 4 Lea (Tenn.) 329. And in *Hey v. Bruner,* 61 Pa. 87, where a tenant covenanted that permanent additions should be left on the property at the expiration of the lease, and to belong to the owners of the premises, it was held that machinery placed on the property by him for the benefit of his business was his personal property. A lease which stipulates that erections or additions placed on the premises shall belong to the landlord on the termination of the lease does not include electrical machinery placed in a leased building for the purpose of furnishing power for an electric light system.—*Liebe v. Nicolai,* 30 Or. 364, 48 Pac. 172."

The rule and the exceptions under discussion have been well stated by this court, as follows: "The general rule of the common law subjected everything affixed to the freehold to the law governing the freehold. This rule never was universal, nor inflexible, nor without exceptions. It was applied most rigorously between executor and heir, in favor of the latter; with more liberality between tenant for life, or in tail, and remainderman or reversioner, in favor of the former; and with still greater generosity between landlord and tenant. An exception in favor of fixtures erected for the purpose of trade seems to have been almost as ancient as the rule itself.—*Elwes v. May,* 3 East's R. 38. The common law of England, however (as has been well remarked by the Supreme Court of the United States), is not to be taken, in all respects, to be that of America. Our ancestors brought with them its general principles, and claimed it as their birthright; but they brought with them, and adopted, only that portion which was

applicable to their condition. The country was a wilderness, and the universal policy was to procure its cultivation and improvement. The interest of the owner of the soil, as well as public policy, in America, required that erections for agricultural purposes, put upon the land by a tenant, should receive the same protection in favor of the tenant that was extended by the common law of England to fixtures made for the purposes of trade."—*Harkness v. Sears*, 26 Ala. 496, 497, 62 Am. Dec. 742.

The English case of *Elwes v. May*, 3 East, 49, 51, was an action upon the case in the nature of waste by a landlord against his late tenant, who held under a term for 21 years. The land in question was a farm consisting of lands, outhouses, and barns. The tenant had during his term erected at his own expense stables, carpenter shop, carthouse, pumphouse, fuelhouse, etc., the buildings being of brick, mortar, and tiling, with foundations about a foot in the ground. Before the ending of the lease the tenant tore down the buildings he had erected, dug up the foundations, and carried away the material; and the court held that he was liable, upon the theory that the structures were all necessary for the convenient occupation of the farm, which could not well be managed without them. That case is contrasted with, and distinguished from, that of the soap boiler who set such fixtures up as were necessary in his trade, and to encourage industry. This case says that indulgence in favor of the tenant has been carried still further by allowing him to carry away things of ornament, as mantels, wainscoting, and other such fixtures. But this court held at that time that no court had gone to the length of establishing the buildings subservient to purposes of agriculture, as distinguished from those subservient to trade, which had been held removable by

an executor or tenant for life. But our own case of *Harkness v. Sears,* 26 Ala. 497, 62 Am. Dec. 742, above quoted from, held that this rule had been extended in America, because public policy required that erections for agricultural purposes, put upon the land by the tenant, should receive the same protection afforded by the common law of England to fixtures for the purposes of trade; but held that the general doctrine of the common law of England, so far as respects heirs and executors, was adopted by our ancestors and became a part of the common law of America.

The rule as to trade fixtures of a tenant is thus stated by Lord Kenyon: "The law will make the most favorable construction for the tenant where he has made necessary and useful erections for the benefit of his trade and which will enable him to carry it on with more advantage."

It was likewise decided by Story, J., in *Van Ness v. Pacord,* 2 Pet. 137, 7 L. Ed. 374, that the rule as to trade fixtures had been extended in the United States to agricultural tenants, and that the owner of the soil, as well as the public, had every motive to encourage the tenant to devote himself to agriculture, and to favor any erections which would aid this result, and that in the poverty of the country in its beginning, a tenant could not afford fixtures of much expense or value, if he were to lose his whole interest therein by the very fact of erection.

Mr. Justice Story held that the question whether a given article is capable of removal as a trade fixture did not depend upon the form or size of the building, whether it had a brick foundation, or whether it was one or more stories high, but that the only question was whether it was designed for the purposes of trade; that a tenant could erect a large, as well as a small,

building; that he could erect it one or two stories high, and with such foundation as he chose; and that he would not be liable for waste in tearing down and removing a wooden building, with a stone cellar and a brick chimney, upon a lot of land which he had rented for 20 years for the purpose of carrying on the business of dairyman, and as a residence for his family and servants while so engaged.—*Van Ness v. Pacard*, 2 Pet. 137, 7 L. Ed. 374.

This doctrine is stated with approval by Mr. Taylor in his work on Landlord and Tenant, § 546.

This same rule was adopted, if not extended, by the Supreme Court of Massachusetts, which held that tenants were permitted to remove all improvements made for the purpose of trade, when the removal would not injure the inheritance.—*Whiting v. Brastow*, 4 Pick. (Mass.) 410. The rule in regard to the removal of fixtures always requires that they be capable of removal without destruction or serious injury to the freehold, unless there is a contract to remove. But, as before stated, no general rule can be laid down for all cases, such removal depending upon the peculiar circumstances of the case.

After an examination of all these reported cases, and of the text-books, we feel sure that the defendant, Tillis, is not liable in this case for the removal of the trade fixtures in question, unless he could be said to be liable under the particular provisions of the contract of lease.

It is claimed by the appellant that, if it cannot be held that defendant is liable for removal of the fixtures generally, he is liable under the particular, express provisions of the contract. These provisions are contained in sections 3 and 5, as follows:

"Third. At the expiration of this lease the second party agrees that the said first parties shall have the

right to enter into and upon said lands and repossess themselves thereof, and that all improvements of whatever kind and nature erected upon said lands during the life of this lease shall revert to the first parties hereto, and become their property in fee simple without process of law."

"Fifth. That in the case of failure upon the part of the said second party hereto to pay said rent when the same shall become due, within 30 days thereafter, or to perform any of the other conditions or stipulations of this lease, after having been given 10 days written notice of his failure to do so, by the said parties of the first part, then and in that event, the said land with all the improvements shall revert to, and become the property of, the said parties without process of law."

We do not think that the word "improvements," as used in this lease, was intended by the parties to be given the meaning contended for by appellant in this case. It is true that it is a very general term, and certainly in its ordinary meaning includes fixtures; and, as was said by the Supreme Court of New York (*Mayor's Case,* 16 How. Prac. 220; s. c., 29 Barb. 363), the word "improvements," as used in a lease, should be held to embrace every addition, alteration, or annexation made by the lessee during the demised term, to render the premises more convenient or useful; that the word "improvement" was comprehensive of all fixtures, and it would be difficult to select a more comprehensive word. And in the case of *Brown v. Penry,* 2 Stark, 403, it was held that a covenant to repair and deliver improvements which might be made would include a veranda erected by the tenant, the lower part of which was attached to posts and fixed in the ground. But in the case of *Hey v. Bruner,* 61 Pa. 87, where the covenant was to yield up and surrender the possession of the

premises, together "with all and every improvement and addition which they (the said lessees) shall construct and make thereon," held, that the tenants had the right to sever and retain trade fixtures, such as a boiler and an engine which was fastened into the foundation of the buildings upon the rented premises, and though the machinery was firmly fixed into the building. The court, in that case, speaking of the provisions of the lease, said: "There is no doubt that the lessor contemplated this machinery to belong to him at the expiration of this lease, but he did not so provide in" it, because "upon a fair reading of" it "there is no doubt the lessee had a right to remove these fixtures and sever them from the freehold" during the lease.

In the case of *Whitney v. Shippen*, 89 Pa. 22-26, the lease provides that "alterations and improvements" made by the tenant shall belong to the landlord, and where the landlord consented to the sale of certain fixtures annexed by the tenant, this showed that the parties had not classed these fixtures as "alterations and improvements."

In the case of *Trenton Brewing Co.*, 56 N. J. Eq. 317, 38 Atl. 861, the lessee covenanted to leave any alterations, repairs, or improvements upon the premises, and that the same should become the property of the lessor. Held, that certain bar fixtures could be removed from the building attached thereto, but that certain gas and electric light fixtures could not be removed, as the latter by their very nature became a part of the realty and the house, while the former were a part of the trade fixtures. The court said: "The presence in the saloon of the bars and their equipment is an improvement in the same sense that a room is improved by chairs, carpets, tables," etc.

This is one of the fullest and best considered cases that we have been able to find upon the subject; and the opinion therein correctly draws the distinction which we think should be drawn in this case, in determining whether or not the "amusement devices" or trade fixtures which were alleged to have been torn down and removed by the defendant in this case are to be embraced in the provisions of the lease.

In the New Jersey case the bars, partitions, doors, mirrors, and beer pump and pipes were held not to be included in the phrase "improvements made upon the premises," but that a chandelier and gas fixtures were to be included, and in that case the court made the distinction which we think should be made in this case. That court said: "The improvements, to be within the provision [of the lease], must, when made, savor of the realty. The association of the words in the clause of the covenant shows this to be the true meaning. It was 'alterations, repairs or improvements made upon the premises.'" And the word "improvements" did not "include articles which were in their nature chattels"; that "the covenant did not refer to improvements brought upon or placed in the demised premises," but to "improvements made of the premises themselves, which were agreed to be left. * * * The true inquiry is not whether the presence of these things is an improvement of the place in the general sense of the questions asked. The presence in the saloon of the bars and their equipment is an improvement in the same sense that the room is improved by the presence of the chairs, tables," etc. "Such things are improvements to the appearance of the place," and cannot "properly be deemed * * * of that fixed character * * * necessary in order to make them improvements of the real estate or its appurtenances." And it was therefore

held in that case that it was "the essence of the covenant" that improvements should be "of the demised premises," and that whether they were betterings or improvements of the realty itself depended upon "their essential nature, and the action and intention of the lessee in relating them to the demised premises," and that in order to constitute trade fixtures an improvement upon the premises within the meaning of the lease, the fixtures "must have been actually annexed to the realty and intended to be a permanent accession to the freehold." It was further held in that case that the bar fixtures "were all stock articles, capable of being put into any saloon large enough to hold them," that none of them were "brought upon the premises * * * to be used in the construction of an improvement of the demised premises."

An annexation of chattels merely incidental to the staying of articles not intended to be incorporated into, or to become a part of, the realty, does not make them improvements within the meaning of the lease.

It was held by Chief Justice Beasley (*Erdman v. Moore*, 58 N. J. Law, 461, 33 Atl. 958) that articles claimed to be fixtures in that case could not, by reason of mere physical connection with the land, be deemed such to the extent that they could not be removed by the tenant. All the courts seem to hold that the element of intention is the conrolling factor in determining whether additions to real estate shall retain apparent indications that they are still personalty and become incorporated into the realty, and that each case must be controlled by the evidence of annexation and intention exhibited in that particular case, and that the difficulty arises in applying the rule.

Where annexation is of such a character as to indicate the purpose to make the chattels a part of the

realty, they will be held to have become realty; but, where it does not indicate such an intent, the chattels do not become a part of the realty or 'improvement,' within the meaning of the lease. It seems to be the settled rule that whenever such connections and additions are made solely as a means of staying or fastening the chattels in their places, to be used in the business of the tenant, without the intention to incorporate them into, or to make them a part of, the realty, they are not improvements of the demised premises within the meaning of such covenants of the lease.

A similar construction to that given such covenants by the New Jersey case has been given by the English courts to such contracts. In the case of *Sumner v. Bromilow*, 34 L. J. Q. B. 130, where the covenant was to yield up the premises and to leave at the disposal of the lessor all fixed materials of all kinds that should be used about the salt works, except certain pans, etc., it was held that the effect of such covenant was to prevent the tenants from removing the landlord's fixtures, but that the tenants' fixtures might be removed, a reasonable time being allowed for this purpose.

In the case of *Foley v. Aldenbrooks*, 13 M. & W. 174 (s. c., 14 L. J. [N. S.] Exch. 169), the covenant was to yield up in repair furnaces, dwelling houses, iron works, and all other improvements and alterations to be thereafter erected (except the iron works castings, railways, gins, and the movable implements and materials used in or about the said furnaces, fire engines, pits, and premises). Held, that the rule as to what should be removed by the lessee was that whatever was in the nature of a machine or a part of a machine, as iron work or iron castings or railways or movable implements or materials, the lessees had a right to remove; and that

whatever was in the nature of buildings or support of buildings the defendant had not a right to remove.

In the case of *Loeser v. Liebmann*, 14 N. Y. Supp. 569, a provision "that all improvements placed in said buildings by the lessee, viz., elevators, boilers, heating apparatus, etc., shall be deemed fixtures not to be removed" was held not to embrace an electric lighting apparatus.

It seems to be the result of all these cases that covenants to redeliver, with all improvements, do not include trade fixtures of the tenant, but do cover all fixtures or improvements of the landlord which were intended, when placed upon the premises, to become a part of, or an improvement of, the freehold.

Construing the lease contract in question, we feel certain that it was never the intention of the parties to this lease, nor that of the subtenants who acquired the interest of the original lessee, that these amusement devices, such as swings, bowling alleys, roller coaster, and "Hale's touring car," brought upon the premises for the amusement of the public, should become a part of the freehold estate, and that they were never considered or treated as improvements of the land itself, but were always understood and treated as chattels or trade fixtures of the tenant.

Surely the tenant, during the life of the lease, could have installed any number of such devices for the amusement of the patrons of the park, and could have removed or changed them at his pleasure and without let or hindrance on the part of the landlord, for the reason that they were of no interest or concern to her. They could not, in any sense, be considered as improvements upon the land when it was rented, or at any other time, except for the purpose of making the resort more attractive—of improving the tenant's trade or business.

[Langhorne, et al. v. Simington.]

For this reason we agree with the trial court that the plaintiff showed no right of recovery, and hold that the affirmative charge was properly given in favor of the defendant.

Affirmed.

ANDERSON, C. J., and McCLELLAN, SAYRE, and SOMERVILLE, JJ., concur.