LaFarge Building Materials, Inc. ("LaFarge"), appeals from the trial court's denial of its postverdict motion for a judgment as a matter of law ("JML"), a new trial, or, alternatively, a remittitur. We affirm in part, reverse in part, render a judgment in part, and remand. *Page 417 
 I. Facts and Procedural History
During the 1980s, the Chattahoochee Valley Railway Company ("Chattahoochee") leased land to Sidney Evans, who used the land to operate Valley Concrete Company in Lanett. Evans paid $100 per month to lease the land and placed improvements on the land to operate the concrete company. In 1987, Evans sold his business and the equipment used in the business to Williams Brothers, Inc., an entity that was LaFarge's predecessor in interest. Shortly after Evans sold the business, LaFarge began to operate the concrete plant and took the additional step of securely attaching the equipment to the property by pouring concrete around the bases of the equipment. Evans remained involved in the concrete plant, working as LaFarge's plant manager from 1987 to 1991. During LaFarge's operation of the concrete plant, it leased the land from Chattahoochee under terms identical to those in the Chattahoochee-Evans lease.
In 1995, Phillip E. Stribling II, an acquaintance of Evans's, purchased the land on which LaFarge's concrete plant was located from Chattahoochee for $7,500. The purchase agreement assigned to Stribling all of Chattahoochee's rights under its lease with LaFarge. Six days after Stribling purchased the land, Evans acquired from Stribling a 50% interest in the land.
On December 31, 1996, LaFarge's lease expired. Stribling notified LaFarge that it could renew the lease at the substantially higher rate of $2,000 a month or it could purchase the property for $100,000. LaFarge declined both offers and opted to vacate the property.
When LaFarge vacated the property, it removed and dismantled several pieces of equipment, apparently the same equipment Williams Brothers had previously purchased from Evans. Additionally, LaFarge destroyed several structures and/or removed several structures from the property. LaFarge admitted that when it vacated the property it left the property in a state of disarray. Subsequently, Stribling and Evans sued LaFarge, alleging breach of contract, wanton or malicious destruction of property, and negligence in removing the equipment and several structures from the plant.
Paragraph 6 of the assigned Chattahoochee-LaFarge lease regarding property improvements is the centerpiece of Evans and Stribling's claim. It provides as follows:
 "6. Any buildings and improvements erected on the leased property by the Lessee shall become the sole property of Lessor at the expiration of the lease term or any extension thereof as herein provided and it is hereby understood and agreed that any building and improvements situated on the leased property at the inception date of the lease is the sole property of the Lessor."
Evans and Stribling argue that the equipment and structures are improvements to the land; therefore, they maintain, according to paragraph 6 of the lease agreement, they owned the equipment and structures.
At trial, Evans and Stribling testified that they intended to operate a concrete plant on the land after the lease expired, and that the removal of the equipment caused them to lose profits of $424,598. LaFarge argued that the removed items consisted of "trade fixtures" and that it was entitled to remove the trade fixtures upon the termination of its lease. Stribling and Evans testified that LaFarge had converted a once portable cement plant into a permanent structure. LaFarge, they said, added concrete walls, anchored silos in cement, added a "batch house," attached a diesel pump into the *Page 418 
cement, and dug a reclamation pond. Stribling and Evans also presented evidence showing that the value of the property declined when LaFarge removed those objects. LaFarge contends that it erected, placed, or attached to the ground all of the equipment at issue, including structures and bins, in furtherance of its trade or business. Stribling and Evans do not contradict this contention. Stribling acknowledged that the purpose of putting the equipment on the property was to carry on a trade or business. At the close of the evidence, Stribling and Evans voluntarily dismissed their negligence and breach-of-contract claims, leaving for consideration by the jury only the tort claims alleging wantonness and intentional conduct. The trial court denied LaFarge's preverdict motion for a JML and instructed the jury as follows on how to determine whether the equipment and the structures were trade fixtures:
 "I will charge you that the intent of the party who installs the property is essential in determining whether property was a business fixture. Intent may be determined by the expressed statements of a party either oral or written or by that party's conduct. In that regard, you may take into consideration the manner in which property was connected to the land, that is, to say whether the property was connected solely as a means of affixing or fastening the property in its place or whether the property was affixed in a manner with the intent of becoming a part of the land."
(Emphasis added.) The jury returned a verdict in favor of Evans and Stribling, awarding them $500,000 in compensatory damages and $1,500,000 in punitive damages.
LaFarge then moved for a postverdict JML, arguing that under Alabama law the equipment and structures were trade fixtures. Further, LaFarge argued that a new trial was necessary because, it argued, (1) the trial court's instructions regarding trade fixtures were erroneous; (2) the trial court refused to charge the jury on the doctrine of equitable estoppel; (3) the trial court improperly allowed the jury to consider evidence of cleanup costs; and (4) the trial court struck the testimony of LaFarge's expert witness. Finally, LaFarge asserted that if the trial court determined that neither a JML nor a new trial was warranted, then the punitive-damages award should be reduced because, it argued, the award violated state and federal constitutional due-process requirements.
The trial court denied LaFarge's motion. In its order, the trial court stated that "there was a legitimate and justiciable dispute as to which items were trade fixtures and which items were a part of the realty. The court will not disturb the jury's verdict in that regard." Further, the court stated that the evidence regarding damages was sufficient and that the testimony of LaFarge's expert witness was properly excluded. In response to LaFarge's request for a remittitur of the punitive-damages award, the trial court stated that the punitive damages were not excessive in light of LaFarge's intentional destruction of the property.
 II. LaFarge's Motion for a Judgment as a Matter of Law
This Court reviews a denial of a motion for a JML by the same standard the trial court used in initially denying the motion.Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala. 1997). Furthermore, we must determine "whether the party who bears the burden of proof had produced substantial evidence creating a factual dispute requiring resolution by the jury." Bell v. T.R.Miller Mill Co., *Page 419 Inc., 768 So.2d 953, 956 (Ala. 2000), citing Carter v.Henderson, 598 So.2d 1350 (Ala. 1992). We view the evidence in a light most favorable to the nonmoving party and entertain any reasonable inferences the jury may have been able to draw.Bell, 768 So.2d at 956. Notwithstanding, we accord the trial court's ruling on a question of law no presumption of correctness. Id.
Under the general rule of the common law, everything annexed to the freehold estate was treated as a part of it. However, tenants placing trade fixtures on the property to be used in connection with trade or manufacturing were excepted from the operation of the foregoing general rule. Walker v. Tillis, 188 Ala. 313,66 So. 54 (1914).
Black's Law Dictionary 652 (7th ed. 1999) defines trade fixtures as "[r]emovable personal property that a tenant attaches to leased land for business purposes." Black's defines an improvement as "[a]n addition to real property whether permanent or not; esp., one that increases its volume or that enhances its appearances." Black's Law Dictionary 761 (7th ed. 1999). A tenant can remove trade fixtures at the end of a lease term evenwhen the lease states that improvements and fixtures are not tobe removed. See Walker, 188 Ala. at 327, 66 So. at 58.
 "It seems to be the result of all these cases that covenants to redeliver, with all improvements, do not include trade fixtures of the tenant, but do cover all fixtures or improvements of the landlord which were intended, when placed upon the premises, to become a part of, or an improvement of, the freehold."
Walker, 188 Ala. at 336, 66 So. at 60.
In Walker, this Court discussed the governing intention of the tenant in determining the availability of the exception applicable to improvements attached to land in the form of trade fixtures, noting:
 "[T]hat the intention of the tenant making the annexation was to serve the convenience of his trade, and not to enhance the freehold; that it was the reasonable intention of the tenant to place such trade fixtures upon the land for the purpose of better enjoying the articles annexed, or of using them in his trade as chattels, and to remove them at his pleasure."
188 Ala. at 325, 66 So. at 57 (emphasis added). Walker
emphasizes that a tenant's intent in "serv[ing] the convenience of his trade," rather than the method by which the article is attached to the land, is critical when determining whether the article is an improvement or a trade fixture. In Walker, this Court stated:
 "[M]ere use, in connection with the business, does not so annex machinery to the realty as to constitute it a part thereof. Intention is more or less a factor in such inquiries. It often depends upon the intention of the party making the annexation."
188 Ala. at 324, 66 So. at 57.
 "[I]t is not so much the manner in which the fixture is attached to the freehold which controls the rights of the parties, as the relation of the parties, the intention in attaching, and the use to which it is put."
Cubbins v. Ayres, 72 Tenn. (4 Lea) 329 (1880) (emphasis added). See also Kennedy v. Lane Foods, Inc. (In re Kennedy),192 B.R. 282, 288 (Bankr.M.D.Ga. 1996) (holding that under Alabama law the intention of the annexing party is the controlling factor in determining the character of the article annexed).
As proof of intent, Evans and Stribling offer paragraph 6 of the Chattahoochee-LaFarge lease and contend that paragraph 6 makes it clear that the improvements *Page 420 
belonged to them, as lessors. Evans and Stribling also rely on the testimony of Bruce Jones, LaFarge's director of properties, whom they called as an adverse witness. Jones testified that he wrote a letter to Stribling stating that all buildings and permanent structures would be left on the property when LaFarge vacated the property. Jones also stated that in his opinion, based upon the terms of the Chattahoochee-LaFarge lease, LaFarge was not entitled to destroy and remove several structures that were on the property. However, at the close of the evidence, Stribling and Evans voluntarily dismissed their breach-of-contract claim. Even had they not done so, underWalker, a tenant can remove trade fixtures at the end of the lease term even when the lease states that improvements and fixtures are not to be removed. Finally, for proof of intent Evans and Stribling rely on LaFarge's conduct in attaching the equipment and the structures and expressly refer to "the nature of the annexation of the buildings and improvements to the land."
Embracing the significance of the nature of the annexation, as opposed to "the intention of the tenant making the annexation . . . to serve the convenience of his trade," Walker,188 Ala. at 325, 66 So. at 57, the trial court instructed the jury that it could "take into consideration the manner in which property wasconnected to the land, that is, to say whether the property wasconnected solely as a means of affixing or fastening the propertyin its place or whether the property was affixed in a manner withthe intent of becoming a part of the land." The trial court's instruction incorrectly applied the law governing ordinary fixtures to a case that should be governed by the law applicable to trade fixtures. Ordinary fixtures are chattel that have been so attached to the land that they become a "part and parcel" of the land. Milford v. Tennessee River Pulp Paper Co.,355 So.2d 687 (Ala. 1978). In determining whether an item is a fixture in a context other than a landlord/tenant relationship where a tenant pursues a business on the leased property, several criteria are used, including the method of annexation:
 "(1) Actual annexation to the realty or to something appurtenant thereto; (2) Appropriateness to the use and purposes of the part of the realty with which it is connected; (3) The intention of the party making the annexation, of making permanent attachment to the freehold. This intention of making the annexation is inferred; (a.) From the nature of the articles annexed; (b.) The relation of the party making the annexation; (c.) The structure of and mode of annexation; (d.) The purposes and uses for which the annexation has been made."
Langston v. State, 96 Ala. 44, 46, 11 So. 334, 335 (1891). See also Sharp v. Sharp, 540 So.2d 1373 (Ala. 1989); ThorntonProps. v. Alabama Power Co., 550 So.2d 1024 (Ala.Civ.App. 1989). Using this test, this Court determined in Milford, where no landlord/tenant relationship existed, that equipment used to clean coal was a fixture to the land because the washers were set in concrete and had been permanently attached to the land for over 20 years.
The exception to the general rule, applicable when a tenant attaches trade fixtures to carry on his business on the leased property, is "stated to be `in favor of trade and to encourage industry,' and has ever since been regarded as the original ground for the exceptions as to trade fixtures made by tenants."Alabama Mach. Supply Co. v. Roquemore, 205 Ala. 244, 247,87 So. 435, 437 (1921). The trial court in MOCO, Inc. v. Gaines,484 So.2d 470, *Page 421 
473 (Ala.Civ.App. 1985),[1] acknowledged the trade-fixture exception and instructed the jury regarding the classification of property as property that has become a part of the real estate or as personal property capable of being removed from the land. The first instruction was identical to the three-pronged test outlined in Langston, supra. MOCO, 484 So.2d at 473. The court then instructed the jury "that where a landowner lets his premises for business purposes, knowing the probable introduction thereon of the implements necessary to carry on the business, he (the landowner) impliedly contracts that the implements will remain personalty." Id.
While it is true that some of the items LaFarge removed constituted equipment attached to the land and some were structures, Walker teaches that structures are nonetheless entitled to be classified as trade fixtures. In Walker, the Court discussed the English case of Elwes v. May, 3 East, 49, 51, in which a landlord sued the departed tenant alleging waste after the tenant had demolished "stables, a carpenter shop, carthouse, pumphouse, fuelhouse, etc., the buildings being of brick, mortar, and tiling, with foundations about a foot in the ground," which the tenant had erected at his own expense. 188 Ala. at 328,66 So. at 58. The English court found for the landlord, distinguishing buildings used for agriculture from those used for trade and affording lesser protection to the tenant engaged in farming. But this Court in Walker then noted that it had rejected the English rule in Harkness v. Sears, 26 Ala. 493
(1855), "because public policy required that erections for agricultural purposes, put upon the land by the tenant, should receive the same protection afforded by the common law ofEngland to fixtures for the purposes of trade." 188 Ala. at 329,66 So. at 58. This Court in Walker then discussed Van Ness v.Pacard, 27 U.S. (2 Pet.) 137 (1829), in which the United States Supreme Court noted the extension of the rule regarding trade fixtures to agricultural tenants and, in so doing, spoke to the applicability of the exception for trade fixtures in the context of structures or buildings:
 "Mr. Justice Story [writing for the Court in Van Ness v. Pacard] held that the question whether a given article is capable of removal as a trade fixture did not depend upon the form or size of the building, whether it had a brick foundation, or whether it was one or more stories high, but that the only question was whether it was designed for the purposes of trade; that a tenant could erect a large, as well as a small, building; that he could erect it one or two stories high, and with such foundation as he chose; and that he would not be liable for waste in tearing down and removing a wooden building, with a stone cellar and a brick chimney, upon a lot of land which he had rented for 20 years for the purpose of carrying on the business of dairyman, and as a residence for his family and servants while so engaged."
Walker, 188 Ala. at 329-30, 66 So. at 58-59 (emphasis added).
Evans and Stribling contend that MacArthur Bros. v.Middleton, 200 Ala. 147, 75 So. 895 (1917), overruled Walker.
However, the structures at issue in Middleton were permanent residences and a rock bin. In Middleton, this Court, apparently based upon language in Walker, upheld the trial *Page 422 
court's refusal to give an abstract instruction, which the tenant had requested, that "the laws are extremely indulgent to the latter [the tenant] with respect to the fixtures annexed for a purpose connected with such temporary possession."200 Ala. at 148, 75 So. at 895. The Court observed in Middleton that "every expression in an opinion does not afford a basis for a special written charge." 200 Ala. at 149, 75 So. at 897. Continuing, the Court stated, "Moreover, the articles dealt with in the Walker Case, supra, were of a very different nature and character, and were designed and used for a different purpose than the buildings in question." 200 Ala. at 148, 75 So. at 895. While the removal of permanent buildings was not in issue in Walker, the dictum in Walker is very clear on the point. Further, in Middleton, as was apparent from an earlier appeal in the case, the landlord contended that pursuant to an oral agreement entered into before construction, the houses, which were to be built on the land for the purposes of the tenant's operation, were to be left on the land and not to be removed from it. See Middleton v. AlabamaPower Co., 196 Ala. 1, 71 So. 461 (1916). As to the rock bin, while the opinion does not state the facts with great clarity, there is a basis from which to conclude that ownership of the rock bin was also resolved before the execution of the agreement before the Court. Here, not only is there no evidence of an agreement dealing specifically with the prospect of the construction of the property at issue, Evans, when he was lessee, under the terms of the same paragraph 6, sold the property to LaFarge's predecessor and only later was the equipment securely attached to the land. We see no basis to retreat from the discussion in Walker of trade fixtures and the effect of clauses attempting to reserve improvements to the lessor as those clauses relate to trade fixtures.
The trial court's instruction here is inconsistent withWalker and places impermissible emphasis on the method of attachment. On the question whether an article attached to land comes within the exception for a tenant's trade fixtures, which displaces the general rule that everything annexed to the freehold becomes a part of it, whether the property was fastened to the land or was attached in such a manner as to give a presumption that the property was a part of the land is not determinative.
Justice Johnstone's dissent maintains that the trial court's instruction is faithful to Walker, relying principally upon the following statement in Walker:
 "It seems to be the settled rule that whenever such connections and additions are made solely as a means of staying or fastening the chattels in their places, to be used in the business of the tenant, without the intention to incorporate them into, or to make them a part of, the realty, they are not improvements of the demised premises within the meaning of such covenants of the lease."
188 Ala. at 335, 66 So. at 60 (emphasis added). The portion of the foregoing passage from Walker tying the intent to fasten the chattels to their use in the business of the tenant is the critical omission from the trial court's instruction. The trial court here let the jury consider "the manner in which property was connected to the land, that is . . . to say whether the property was connected solely as a means of affixing of fastening the property in its place or whether the property was affixed in a manner with the intent of becoming a part of the land." Conspicuously absent from this formulation is the crucial inquiry as to whether there was an intent that the property "be used in the business of the tenant." Walker, 188 Ala. at 335,66 So. at 60. *Page 423 
This approach to the issue of intent in the law of trade fixtures is not only consistent with Walker, it is in the mainstream of today's jurisprudence. See, e.g., ColonialPipeline Co. v. State Dep't of Assessments Taxation,371 Md. 16, 34-35, 806 A.2d 648, 659 (2002), in which the court held:
 "The trade fixtures exception to the common law rule of fixtures dates back almost as far as the common law rule itself. Van Ness v. Pacard, 27 U.S. 137, 143-44, 2 Pet. 137, 7 L.Ed. 374, 376-77 (1829). In 1802, this Court held in Kirwan [v. Latour, 1 H. 
J. 289 (1802)] that `where a tenant puts up any thing for the purpose of carrying on his trade, he may remove it.' 1 H. J. at 291. A trade fixture commonly is defined as an item affixed to realty for the purpose of enabling the tenant to perform properly a trade or profession, which can be removed without material or permanent injury to the realty. [Richard R. Powell, Powell on Real Property] § 57-45 [(1969)]. The touchstone for the trade fixtures test, like the Dudley [v. Hurst, 67 Md. 44, 48, 8 A. 901, 902 (1887)] fixtures analysis, is intent: `[t]he sole question is, whether it is designed for purposes of trade or not.' Van Ness, 27 U.S. at 146, 7 L.Ed. at 378. See also Dudley, 67 Md. at 48, 8 A. at 902 (stating that of the prongs of the fixtures test, `the most important is the question of intention'). When the proper intent is found, `[n]o matter how strongly [the fixtures are] attached to the soil or imbedded in it, they are treated as personal property, and as such subject to removal by the person erecting them.' N. Cent. Ry. Co. v. The Canton Co., 30 Md. 347, 352 (1869)."
(Emphasis added.)
Although Walker dealt with amusement-park rides and we deal here with the components of a concrete plant, this distinction does not alter the result in light of the facts before us. As previously noted, Evans was once the tenant of this very same property he now owns. It was Evans, the tenant, who brought the components of the concrete plant to the property, and it was Evans, the tenant, who, at the end of his status as tenant, sold the components to LaFarge's predecessor as it became the new tenant on this same property. It was Evans who pocketed the entire proceeds of the sale of the components, to the exclusion of the landlord. Now, after LaFarge poured concrete around these components and added silos and bins with the undisputed intent to further its pursuit of its trade, the same Evans, in his new role as landlord, with Stribling, of the very same property, after having announced a rent increase from $100 per month to $2,000 per month, claims that the components of the concrete plant he previously sold as trade fixtures have become the property of the landlord.
We would reverse the trial court's judgment so that a new trial could be had on the issue of trade fixtures at which a correct instruction could be given authorizing the jury to consider whether LaFarge installed the property with the intent to use it in furtherance of its trade or business if there was evidence to the contrary. However, as previously noted, it is undisputed that the property in question was installed for the purpose of furthering LaFarge's business. Therefore, we render a judgment in favor of LaFarge on that issue.
In their complaint, Evans and Stribling listed three separate counts against LaFarge for breach of contract, wanton or malicious destruction of property, and negligence. After each claim, Evans and Stribling requested damages for *Page 424 
the value or replacement cost of property that we now deem to be trade fixtures, as well as $468,645 to clean the property. At trial, Evans and Stribling offered evidence of damage to the land separate from the removal and destruction of property that we deem trade fixtures in the form of the cost of cleaning up the property.[2] In support of its preverdict motion for a JML, LaFarge, in addition to contending that the removed items were trade fixtures, also argued that Evans and Stribling were not allowed to recover any costs for the removal of debris other than the debris created from the destruction of two concrete buildings. In its postverdict motion for a JML, LaFarge further argued that the trial court erred by charging the jury that it could award damages for restoration of the property or for cleanup costs. On appeal, LaFarge contends that Evans and Stribling could recover only the difference between the value of the property before and after the property was damaged. LaFarge hinges its argument upon ordinary principles of real property law and not on the law of trade fixtures.
The Court in Walker observed that "[t]he rule in regard to the removal of fixtures always requires that they be capable of removal without destruction or serious injury to the freehold, unless there is a contract to remove." 188 Ala. at 330,66 So. at 59 (emphasis added). Although a tenant may have the right to remove trade fixtures, it does not have the right to damage the freehold in the process. The trial court correctly noted in its order denying LaFarge's postverdict motion for a JML that "[e]ven if all the of the property removed and damaged by [LaFarge] were considered to be trade fixtures the manner of removal and destruction could be considered to be excessive. . . ." In accordance with the rule in Walker, LaFarge is liable for the destruction or injury to the property resulting from the removal of the trade fixtures in an amount equal to the cleanup costs.[3] Consequently, although the trial court erred in denying LaFarge's motion for a JML as to the claim for damages for removal of trade fixtures, the court properly denied the motion as to the claim for cleanup costs.
 III. Conclusion
We affirm the trial court's order insofar as it denied LaFarge's motion for a JML on the count of the complaint seeking damages for cost of cleanup, and we remand for a new trial as to the issue of damages. However, insofar as the trial court's order awarded damages for removal of trade fixtures, we reverse and render a judgment in favor of LaFarge.
AFFIRMED IN PART; REVERSED IN PART; JUDGMENT RENDERED IN PART; AND REMANDED.
HOUSTON, SEE, BROWN, HARWOOD, WOODALL, and STUART, JJ., concur.
JOHNSTONE, J., concurs in part and dissents in part.
[1] The jury instructions were not at issue in MOCO. However, the Court of Civil Appeals reversed the judgment entered on the jury's verdict because the weight of the evidence, in light of the jury instructions, supported a conclusion that the items were trade fixtures as opposed to improvements that become part of the real estate.
[2] Evans testified that the property was worth $250,000 to $500,000 before the plant was removed and after the removal the property was worth "a minus $122,000." Evans then stated, "That's what it's going to cost to clean it up."
[3] Accord, Seeger v. Pettit, 77 Pa. 437 (1875) ("The true rule to be deduced from these authorities is, that it is not the character of the physical connection with the realty which constitutes the criterion of annexation, but it is the intention to annex. Where a tenant puts in fixtures or conveniences for his own comfort, the law raises no presumption that he intended them as permanent improvements, to be left for the benefit of his landlord; and as a general rule he will be entitled to remove them during his term. For any injury to the freehold by reasonof such removal, he is of course liable to the landlord indamages." (emphasis added)). *Page 425