MENDHEIM, Justice.
*831 Brian Pipkin appeals from the Mobile Circuit Court's summary judgment in favor of Sun State Oil, Inc. ("Sun State"), on Pipkin's claims of conversion, negligence, and/or wantonness, and trespass with regard to Sun State's removal of gasoline pumps from Pipkin's property. We reverse and remand.
I. Facts
On January 21, 2011, IMAS Partnership, LLC ("IMAS"), purchased from William Rivers and Sybil Rivers a parcel of real property located at 15065 Highway 43 North, Bucks, Alabama ("the property"), on which was situated a convenience store and gasoline station. IMAS intended to operate the business as "Bucks Country Store."
On September 13, 2010, in anticipation of its acquisition of the property, IMAS entered into a "Petroleum Supply Agreement" with Sun State to procure a supply of gasoline to sell to customers of the store ("the PSA"). The PSA provided that Sun State would lease two gasoline pumps to IMAS for 10 years in exchange for IMAS purchasing a minimum of 6 million gallons of petroleum from Sun State over the 10-year term. Specifically, the PSA provided, in part:
"1.
"TERM AND PREMISES
"The Agreement shall be effective for a term of Ten (10) years from and after the date of execution by [IMAS]. During the term hereof, [Sun State] shall supply and [IMAS] will purchase all of the supplies which [IMAS] needs to serve [IMAS's] customer[s] at the Business Premises. [IMAS] shall be responsible to furnish the Business Premises with all buildings and equipment necessary for the operation of a service station, with the exception of the equipment to be furnished by [Sun State] as set forth herein....
"2.
"PRODUCTS AND QUALITY
"Commodity Schedule
"Total gallons to be purchased during term -- 6,000,000, and all requirements of Supplies to be sold from the Business Premises.
"(a) [Sun State] agrees to sell to [IMAS] and [IMAS] agrees to purchase from [Sun State] the product(s) covered by this Contract in the quantities shown on the Commodity Schedule indicated above....
"....
"3.
"LOANED EQUIPMENT AND BRANDING
"(a) [Sun State] agrees to furnish and lend to [IMAS] and [IMAS] agrees to lease from [Sun State] the following items of equipment and branding, delivered and installed at [IMAS's] location. Pending the receipt of the following new equipment by [Sun State] for installation on the Business Premises, [Sun State] shall be permitted to install used or reconditioned equipment:
"Quantity Description
"....
"2 New Gasoline MPDs with card readers
"....
"(b) [IMAS] agrees to use the said equipment only for the purpose of advertising, handling, storing, or otherwise facilitating the marketing at the stated delivery address of petroleum or other products purchased from [Sun State] and in compliance with all laws and requirements of all authorities having jurisdiction thereof.
"(c) The value of the equipment as determined by [Sun State] shall be *832 amortized over a Ten (10) year period with interest rate of 10% per annum. So long as [IMAS] is not in default of this Agreement, the Total Agreed Value shall be amortized and reduced pro-rata over the term of this Agreement based upon the percentage of the minimum gallons purchased by [IMAS] as of the date of expiration or termination of this Agreement. In the event of a breach of this Agreement, or the failure of [IMAS] to satisfy its minimum gallons, the balance due shall be immediately due and payable from [IMAS] to [Sun State], and shall bear interest at the rate of 18% per annum thereafter, both prejudgment and postjudgment....
"(d) The equipment, which term includes any replacements and additions, shall remain the personal property of [Sun State], and shall have displayed thereon such markings, colors and/or trademarks as [Sun State] designates. [IMAS] shall execute a UCC-1 Financing Statement governing the loaned equipment for filing with the Florida Secretary of State.[1 ] Upon breach or termination of this Agreement, [IMAS] agrees to redeliver said equipment detached from the Business Premises in the same condition as when received, reasonable wear and tear excepted, to [Sun State] at [Sun State's] address or any address designated hereafter by [Sun State]. A failure to do so shall authorize [Sun State] to enter [IMAS's] Business Premises and, without liability for damages or trespass, use all reasonable means to remove said equipment. [IMAS] shall then pay [Sun State] any cost incurred in detaching the equipment and the cost of transporting such equipment to [Sun State's] designated address. Upon the successful completion of the requirements of this Agreement, [Sun State] shall transfer title to the loaned equipment to [IMAS] by Bill of Sale.
"....
"11.
"TERMINATION
"(a) This Contract shall terminate upon expiration of the term stated in Paragraph one (1) above.
"(b) This Contract may be terminated by [Sun State]:
"....
"(ii) If [IMAS] fails to pay in a timely manner any sums when due hereunder;
"(iii) If [IMAS] defaults in any of its obligations under this Contract;
"....
"(v) If [IMAS] fails to purchase the minimum gallonage requirements outlined in paragraph 2, the Commodity Schedule, [IMAS] shall be permitted to apportion and allocate the minimum gallonage requirements over a quarterly basis to determine if [IMAS] is meeting its minimum requirement (i.e., 150,000 gallons per quarter). In the event of termination by [Sun State] pursuant to this provision, [IMAS] shall make payment in full of any amounts due from [IMAS] to [Sun State] pursuant to the equipment loan as described herein; shall make repayment in full of the rebates received by [IMAS] according to the following table, any damages or charges incurred by [IMAS] from Citgo or such other supplier as directed by [Sun State], and payment in full by [IMAS] of the lost profits of [Sun *833 State] for the remaining and unused full term of this Agreement as calculated by [Sun State] based upon the average sales of [IMAS] to the date of termination all of which amounts shall be then accelerated and immediately due and payable.
"....
"(c) This Contract may not be terminated by [IMAS], nor may it be assigned, without the express written consent of [Sun State]. In the event of such consent by [Sun State], such termination shall only be effective upon payment in full by [IMAS] of any amounts due from [IMAS] to [Sun State] pursuant to the equipment loan and/or promissory note as described herein, the payment in full by [IMAS] of any rebates received by [IMAS], and payment in full by [IMAS] of the lost profits of [Sun State] for the remaining and unused full term of this Agreement as calculated by [Sun State] based upon the average sales of [IMAS] to the date of termination, or the minimum gallonage requirements, whichever is greater.
"....
"(e) Termination of this Contract for any reason shall not relieve the parties of any obligation there[to]fore accrued under this Contract. In the event of the termination of this Agreement for any reason, [IMAS] shall additionally make payment in full of any amounts due from [IMAS] to [Sun State] pursuant to this Agreement, the equipment loan as described herein, the lost profits of [Sun State] as set forth herein, any unamortized equipment loan or lease payments, any damages or charges incurred by [IMAS] from Citgo or such other supplier as directed by [Sun State], and repayment in full of the rebates received by [IMAS], all of which amounts shall be then accelerated and immediately due and payable. Such payments shall be due immediately upon termination of this Agreement. However, should [Sun State] cancel this Agreement due to [Sun State's] inability to supply petroleum products to [IMAS] ... due to [Sun State's] inability to procure such products from Citgo or such other supplier as determined by [Sun State] on terms agreeable to [Sun State], then [IMAS] may make repayment of equipment loan on a monthly basis.
"...."
(Emphasis added.)
In January and February 2011, Sun State installed two new gasoline pumps on the property. At some point in 2012, Sun State stopped doing business with IMAS because, according to Sun State representative Richard E. Blow II, "[w]hat I was told by one of the members of IMAS was that they were not making money at the store and they were going to have to give the keys back to the Riverses."
On July 20, 2012, IMAS executed a warranty deed in lieu of foreclosure conveying the property back to the Riverses. That deed contained no specific reference to the gasoline pumps. According to Blow, the reason Sun State did not reclaim the gasoline pumps at that time was "[p]rimarily because we had talked with the Riverses about leaving the pumps at the facility for a period of time to let them get a tenant in there .... So we were trying to maintain the store as a customer."
On December 13, 2013, the Riverses executed a vendor's lien deed conveying the property to Pipkin for a purchase price of $75,000. Pipkin testified by deposition that William Rivers made it absolutely clear when they negotiated the sale of the property that the gasoline pumps were included in the purchase price.
*834 Shortly after Pipkin purchased the property, he received a telephone call from Blow in which Blow told Pipkin that Sun State owned the gasoline pumps and that he wanted to know what Pipkin intended to do with the property. According to Pipkin, he told Blow that he had purchased the gasoline pumps along with the rest of the property. A few weeks later, in January 2014, Pipkin and Blow met in person to discuss the possibility of Sun State supplying gasoline to Pipkin, but Pipkin stated that he did not yet know what he wanted to do with the property.
According to Blow, near the summer of 2014, he telephoned Pipkin and told him that he had seen some "shady characters" loitering around the property and that Sun State was concerned about the gasoline pumps. In June 2014, Sun State hired a company to come onto Pipkin's property and remove the gasoline pumps. Blow testified that he told Pipkin that the reason the gasoline pumps were being removed was that Sun State was "concerned about vandalism [or] theft" but that the gasoline pumps could be reinstalled once Pipkin "had a tenant ready, willing, and able, or if he was going to operate the store." Blow testified that the gasoline pumps were moved to a warehouse in Pensacola, Florida.
In a letter dated June 20, 2014, addressed to Blow in his capacity as a representative of Sun State, counsel for Pipkin demanded that Sun State return the gasoline pumps to the property because, he said, counsel had "searched the UCC records of the Alabama Secretary of State and [did] not see where a UCC financing statement was filed regarding the pumps." Sun State declined to return the gasoline pumps.
On September 12, 2014, Pipkin sued Sun State and the Riverses in the Mobile Circuit Court. Against Sun State, Pipkin asserted claims of conversion, negligence, and/or wantonness for removing the gasoline pumps from the property. Pipkin asserted claims of breach of warranty and misrepresentation against the Riverses, "[a]ssuming Sun State is the legal owner of the gas pumps."
In February 2015, Sun State filed an answer to Pipkin's complaint in which it denied all material allegations.
On October 10, 2016, Pipkin filed an amendment to the complaint in which he added a claim of trespass against Sun State. On November 8, 2016, Sun State filed an answer to the amendment to the complaint in which it again denied all material allegations.
On November 21, 2016, Pipkin filed a motion for a partial summary judgment against Sun State in which he requested that the trial court declare that Sun State was not the owner of the gasoline pumps and that, therefore, Sun State had no right to remove the gasoline pumps from the property. In the motion, Pipkin contended that Sun State, rather than owning the gasoline pumps, had a security interest in the gasoline pumps but that it had failed to perfect that security interest by making a filing pursuant to Article 9 of the Uniform Commercial Code ("the UCC"). The trial court set Pipkin's motion for argument on February 10, 2017. On February 8, 2017, Sun State filed a response in opposition to Pipkin's motion for a partial summary judgment in which it contended that it owned the gasoline pumps and that it had a right to remove them from the property because the gasoline pumps were "trade fixtures."
The following day, February 9, 2017, Sun State filed its own motion for a summary judgment in which it provided a more extensive argument that the gasoline pumps were trade fixtures and also that *835 the UCC did not apply to the PSA. The trial court did not expressly set Sun State's motion for a summary judgment for argument. On February 10, 2017, oral argument was held on Pipkin's motion for a partial summary judgment.
On May 19, 2017, the trial court entered an order in which it granted Sun State's motion for a summary judgment and denied Pipkin's motion for a partial summary judgment. At the outset of the order, the trial court explained that, "[d]ue to the fact that the issues presented by Defendant Sun State's Motion [for a summary judgment] are substantially the same as those presented in [Pipkin's] Motion [for a partial summary judgment], oral argument was not granted on Defendant Sun State's Motion." After detailing the facts of the dispute, the order provided the trial court's reasons for its disposition:
"6. It is clear and unambiguous that IMAS breached the terms of the PSA when it failed to uphold its obligations thereunder for the entire ten-year term. Although IMAS performed for a short period of time under the PSA, full performance for the entire ten-year term was a condition precedent to any transfer of ownership of the gas pumps from Sun State to IMAS.
"7. This Court finds that no transfer of ownership of the pumps from Sun State to IMAS occurred as a result of the PSA by sale or otherwise. Therefore, at all times, Sun State remained the legal owner of the gas pumps.
"8. Sun State placed the pumps on the Property with the sole purpose of facilitating IMAS's retail sale and delivery of petroleum that IMAS had agreed to purchase from Sun State. Therefore, this Court finds that the gas pumps were trade fixtures of Sun State and, consequently, did not become part of the Property when affixed thereto by Sun State. Contrary to [Pipkin's] argument, [Pipkin] did not become the owner of the gas pumps at the time that he purchased the Property from Mr. and Mrs. Rivers merely because the gas pumps were affixed to the Property.
"9. Because Sun State retained ownership of the pumps at all times as trade fixtures, Sun State had the right to peaceably enter the Property to peacefully reclaim the gas pumps at the time that IMAS breached the PSA and at all times thereafter. Sun State's recovery of the gas pumps from the Property was carried out in a reasonable and peaceful manner consistent with its rights."
The trial court further concluded that, because Sun State was the legal owner of the gasoline pumps when it had them removed from the property, Sun State could not be liable for conversion, negligence and/or wantonness, or trespass based on that removal. The trial court certified its judgment in favor of Sun State as final pursuant to Rule 54(b), Ala. R. Civ. P. Pipkin appeals.
II. Standard of Review
"We review the trial court's grant or denial of a summary-judgment motion de novo, and we use the same standard used by the trial court to determine whether the evidence presented to the trial court presents a genuine issue of material fact. Bockman v. WCH, L.L.C., 943 So.2d 789 (Ala. 2006). Once the summary-judgment movant shows there is no genuine issue of material fact, the nonmovant must then present substantial evidence creating a genuine issue of material fact. Id. 'We review the evidence in a light most favorable to the nonmovant.' 943 So.2d at 795. We review questions of law de novo. Davis v. Hanson Aggregates Southeast, Inc., 952 So.2d 330 (Ala. 2006)."
*836 Smith v. State Farm Mut. Auto. Ins. Co., 952 So.2d 342, 346 (Ala. 2006).
III. Analysis
Pipkin contends that the trial court committed reversible error when it concluded that the gasoline pumps were trade fixtures, which gave Sun State the right to peaceably reclaim the gasoline pumps even lacking his permission to enter the property. Pipkin further argues that the PSA was not a lease, but was, in fact, a secured sale agreement for the gasoline pumps, and that, because Sun State never perfected its security interest in the gasoline pumps through a fixture filing, his purchase of the gasoline pumps are free from Sun State's security interest.
Pipkin's argument that the PSA is actually a disguised security transaction is based upon § 7-1-203, Ala. Code 1975, a part of the UCC titled "Lease distinguished from security interest." Before we address the issue whether the PSA is a lease or a sale of goods disguised as a lease, however, we must evaluate the trial court's conclusion that the gasoline pumps were trade fixtures. Unlike fixtures generally, a trade fixture retains its status as personal property and does not become part of the real property to which it is affixed. See, e.g., Walker v. Tillis, 188 Ala. 313, 326-27, 66 So. 54, 58 (1914) (explaining that trade fixtures "remain the personal property of the tenant without the consent of the landlord"). As a comment to § 7-9A-334, Ala. Code 1975 -- which addresses the priority of security interests in fixtures -- notes:
"In considering priority problems under this section, one must first determine whether real-property claimants per se have an interest in the ... fixtures as part of real property. If not, it is immaterial, so far as concerns real property parties as such, whether a security interest arising under this Article is perfected or unperfected. In no event does a real-property claimant (e.g., owner or mortgagee) acquire an interest in a 'pure' chattel just because a security interest therein is unperfected. If on the other hand real-property law gives real-property parties an interest in the goods, a conflict arises and this section states the priorities."
Comment 4 to § 7-9A-334, Ala. Code 1975. In other words, a fixture filing is not necessary to preserve an owner's interest in personal property located on real property owned by another. Thus, even if Pipkin is correct that the PSA created a security interest in the gasoline pumps rather than being a mere lease of those items, IMAS -- and Pipkin as a subsequent purchaser of the property -- would not have acquired an ownership interest in the gasoline pumps if they were simply personal property owned by Sun State, i.e., trade fixtures. Only if the trial court erred in categorizing the gasoline pumps as trade fixtures will it be necessary to assess whether the PSA was a lease or a disguised sale of goods under § 7-1-203.
A. Are the Gasoline Pumps Trade Fixtures?
Pipkin contends that there is a glaring problem with the trial court's conclusion that the gasoline pumps are trade fixtures. Pipkin argues that the law applicable to trade fixtures applies only in the context of a landlord-tenant relationship and that Sun State was neither a landlord nor a tenant as to the property.
"[A] trade fixture is an article annexed to realty by a tenant for purposes of carrying on the tenant's trade or business." Sycamore Mgmt. Grp., LLC v. Coosa Cable Co., 42 So.3d 90, 94 (Ala. 2010) ; see also Walker, supra. This Court previously has expounded on the trade-fixtures *837 doctrine in LaFarge Building Materials, Inc. v. Stribling, 880 So.2d 415, 419 (Ala. 2003) :
"Under the general rule of the common law, everything annexed to the freehold estate was treated as a part of it. However, tenants placing trade fixtures on the property to be used in connection with trade or manufacturing were excepted from the operation of the foregoing general rule. Walker v. Tillis, 188 Ala. 313, 66 So. 54 (1914).
"Black's Law Dictionary 652 (7th ed. 1999) defines trade fixtures as '[r]emovable personal property that a tenant attaches to leased land for business purposes.' Black's defines an improvement as '[a]n addition to real property whether permanent or not; esp., one that increases its volume or that enhances its appearances.' Black's Law Dictionary 761 (7th ed. 1999). A tenant can remove trade fixtures at the end of a lease term even when the lease states that improvements and fixtures are not to be removed. See Walker, 188 Ala. at 327, 66 So. at 58.
" 'It seems to be the result of all these cases that covenants to redeliver, with all improvements, do not include trade fixtures of the tenant, but do cover all fixtures or improvements of the landlord which were intended, when placed upon the premises, to become a part of, or an improvement of, the freehold.'
" Walker, 188 Ala. at 336, 66 So. at 60.
"In Walker, this Court discussed the governing intention of the tenant in determining the availability of the exception applicable to improvements attached to land in the form of trade fixtures, noting:
" '[T]hat the intention of the tenant making the annexation was to serve the convenience of his trade, and not to enhance the freehold; that it was the reasonable intention of the tenant to place such trade fixtures upon the land for the purpose of better enjoying the articles annexed, or of using them in his trade as chattels, and to remove them at his pleasure.'
" 188 Ala. at 325, 66 So. at 57 (emphasis added). Walker emphasizes that a tenant's intent in 'serv[ing] the convenience of his trade,' rather than the method by which the article is attached to the land, is critical when determining whether the article is an improvement or a trade fixture."
(First emphasis added.)
The doctrine of trade fixtures generally appears within the context of a landlord-tenant relationship. This is not surprising, given that the general understanding is that "[t]he doctrine of trade fixtures is limited in its application to situations in which a landlord and tenant relationship exists, and is not applicable in case[s] in which the owner of land attaches fixture to realty." 35A Am. Jur. 2d Fixtures § 33 (2010) (citing Young Elec. Sign Co. v. Erwin Elec. Co., 86 Nev. 822, 827, 477 P.2d 864, 867 (1970) ). It must be remembered that trade fixtures constitute an exception to the common-law rule that items affixed to real property become part of that property. See Walker, 188 Ala. at 326, 66 So. at 57-58 (" 'The general rule at common law that whatever was annexed to the freehold became a part of it seems always to have been subject to an exception in favor of tenants who placed fixtures on property to be used in connection with trade or manufacturing.' " (quoting 84 Am. St. Rep. 884) ). This exception arose from a desire to encourage the businesses and industries of tenants. Under the general common-law rule, such tenants -- and third-party suppliers of their business instruments -- would lose ownership of instruments essential *838 to the tenants' businesses by virtue of attaching those instruments to real property the tenants did not own. The trade-fixture exception allowed such business instruments to be affixed to real property not owned by a tenant without fear that the tenant who installed his own instruments, or a third-party supplier who provided such instruments to the tenant, would lose ownership of the instruments to the landlord.[2] See, e.g., Rosemary Williams, 136 Am. Jur. Proof of Facts 3d 357, Proof That Item of Personal Property Has Become Fixture of Real Property or Trade Fixture § 3 (2013) (explaining that "[l]essors are understandably desirous of retaining improvements which could enhance the rental value of the leasehold, particularly where the lessor has participated in adapting the leasehold to the tenant's particular requirements. But tenants generally want to preserve the business use of the personalty for sale or use in future business operations. Lenders in the situation of advancing monies against machinery and equipment placed in leased property want to be able to realize the value of the collateral. The recovery of any one will be a loss to the other, and from these conflicts, the doctrine of the trade fixture was created").
As Walker explains, the history of the trade-fixture exception dates back to England:
"In Poole's Case, 1 C. 368, decided in the year 1703, Holt, C.J., held that a tenant who was by trade a soap boiler, and had, for the convenience of his trade, put up vats, copper boilers, partitions, etc., and paved the back yard, had the right during the term of his lease to remove such fixtures. This is probably the first case that put the question of trade fixtures of a tenant upon a clear and satisfactory basis; and the rule was stated to be in favor of trade, and to encourage industry, and has ever since been regarded as the original ground for the exceptions as to trade fixtures made by tenants."
188 Ala. at 324-25, 66 So. at 57.
With this background, it becomes clear that the purpose behind the trade-fixture exception does not exist in this case. As Pipkin observes: "It is undisputed that when Sun State entered into the [PSA] with IMAS to install the gasoline pumps, IMAS was the owner of the Property, not a tenant." Pipkin's brief, p. 23. The gasoline pumps were installed to further IMAS's business, not the business of a tenant. As the owner of the property, IMAS had no reason to fear losing ownership of the gasoline pumps, because under the general common-law rule, items an owner affixed to his or her property became part of the property. On the other hand, Sun State had no relationship to the property either by ownership or by possession; it was simply a supplier of gasoline and materials to IMAS. Thus, Sun State's avenue for preserving its interest in the gasoline pumps could not be through the common-law doctrine of trade fixtures, but rather through the PSA -- its contract with IMAS -- which is precisely what occurred.
That the presence of a landlord-tenant relationship is integral to the application of the trade-fixture exception is well illustrated by Sycamore Management Group, LLC v. Coosa Cable Co., supra. Sycamore concerned *839 the ownership of a cable-television-distribution system in an apartment complex known as Maple Village. The Court's opinion detailed the undisputed facts:
"Maple Village was constructed in 2004; EYC Companies ('EYC') owned the property and managed the apartment complex after the construction was completed. During the construction phase, Coosa Cable installed, at its own expense, a full cable-distribution plant at the Maple Village complex, including wiring and other equipment. Coosa Cable and EYC never entered into a contract for the provision of cable service to residents of Maple Village, nor did Coosa Cable pay EYC a fee for the privilege of serving the residents of Maple Village. The residents of Maple Village had the option to contract on a month-to-month basis with Coosa Cable for individualized service plans, including cable television, Internet services, and primary telephone service -- including 911 service. Coosa Cable dealt directly with its customers at Maple Village; i.e., it billed the customers individually. Coosa Cable's arrangement with the residents at Maple Village was nonexclusive in that the residents there were free to contract with other cable and/or communications providers.
"Sycamore acquired Maple Village from EYC in March 2007. On August 12, 2008, Sycamore entered into a written agreement with DirecPath whereby DirecPath would have the exclusive right to provide video-programming services (and a nonexclusive right to provide Internet and telephone services) to the residents of Maple Village. Debbie Taylor, the owner/manager of Sycamore, testified that Sycamore would receive approximately $700 to $1,100 per month under the agreement. Both Sycamore and DirecPath were aware of Coosa Cable's business relationships with many of the Maple Village residents."
42 So.3d at 92.
Coosa Cable sued Sycamore and DirecPath seeking injunctive relief preventing them from " 'interfering with Coosa Cable's access to its equipment' " and from " 'misappropriating Coosa Cable's personal property in the form of its distribution plant, wiring, and equipment.' " 42 So.3d at 92-93. Coosa Cable contended that "the cable wiring and related equipment are 'trade' fixtures and are, therefore, the personal property of Coosa Cable." 42 So.3d at 94. The trial court granted Coosa Cable's request for injunctive relief.
On appeal, this Court agreed with Sycamore and DirecPath that "the wires and equipment were fixtures attached to real property but not trade fixtures," stating: "Coosa Cable's argument that the wires and equipment are 'trade' fixtures does not apply in this fact situation because Coosa Cable does not have a landlord-tenant relationship with Sycamore, nor did it have such a relationship with Sycamore's predecessor, EYC." 42 So.3d at 94-95. Thus, in Sycamore, Coosa Cable was a third-party supplier that installed the cable-distribution system for the property owner -- just as Sun State installed the gasoline pumps for IMAS -- and the Court concluded that the trade-fixture exception was not available to Coosa Cable to establish continued ownership of the cable-distribution system because no landlord-tenant relationship existed.
Sun State attempts to distinguish the principle that the trade-fixture exception applies only in landlord-tenant relationships by highlighting a statement from MOCO, Inc. v. Gaines, 484 So.2d 470, 474 (Ala. Civ. App. 1985) :
"Generally, where the owner of the realty permits persons with no interest in the realty to attach articles onto the *840 realty, as in this case, the right of the person annexing the articles to remove them is implied. 5 American Law of Property § 19.10 (A.J. Casner 1952). A licensee, tenant, or tenant-at-will may remove fixtures attached for the purpose of carrying on his trade or business. See American Law of Property § 19.1-23.66, supra. See also, Milford v. Tennessee River Pulp & Paper Co., [355 So.2d 687 (Ala. 1978) ]."
(Emphasis added.) Without citation to any other authority, Sun State argues: "While a landlord-tenant relationship may be the most frequently seen form of a relationship sufficient to support a trade fixture finding, it is not, contrary to Pipkin's assertions, necessary. A licensor-licensee relationship also supports a trade fixture finding." Sun State's brief, p. 17.
MOCO, however, is inapplicable because it involved a third-party supplier of gasoline pumps and tanks to tenants for the tenants' business on a landlord's property. In MOCO, the third-party supplier sued the tenants seeking possession of the gasoline pumps and tanks after an arrangement between the third-party supplier and the tenants had ended. The tenants contended that the gasoline pumps and tanks belonged to the landlord because they were affixed to the property. See MOCO, 484 So.2d at 473. In response to that argument, the Court of Civil Appeals provided the statement quoted in the previous paragraph. Thus, the reason for the application of the trade-fixture exception in MOCO was clear: A landlord-tenant relationship was involved. The court's reference to a "licensee" was not to the third-party supplier but to one who, like a tenant, is an occupier, but not an owner, of the real property in question.[3] No such person exists in the present case; IMAS was the owner and the party ultimately purchasing the gasoline pumps that were installed on its property.
Sun State subsequently states in its brief that "[t]he pumps were placed on the Property by Sun State (as licensee) pursuant to a contract with IMAS." Sun State's brief, p. 18. But the PSA did not state that it granted Sun State a license: The PSA was either a lease or a secured sale agreement. Thus, any "license" to install the gasoline pumps would have to be implied. As Pipkin notes, even if such a license could be implied,
"such a license came from IMAS, not from the Rivers[es] and not from Pipkin.... Sun State was no longer a licensee (if it ever was) after IMAS deeded the Property back to [the] Rivers[es].... IMAS cannot grant a license to Sun State to access real property it no longer owns. The license, if any, is extinguished with IMAS's loss of ownership in the property."
Pipkin's reply brief, pp. 11-12. In sum, the assertion that the gasoline pumps were trade fixtures based on Sun State's status as a licensee is without merit.
*841 Because the trade-fixture exception is available only to a landlord-tenant or one with a similar property owner-occupier relationship, and Sun State's contract was with IMAS, the owner of the property upon which the gasoline pumps were installed, the trial court erred in applying the trade-fixture exception to the gasoline pumps in this case. Therefore, any claim of ownership of the gasoline pumps by Sun State must be based upon the PSA rather than the common-law doctrine of trade fixtures.
B. Was the PSA a True Lease or a Secured-Sale Agreement?
As we noted at the outset of this analysis, Pipkin contends, based upon § 7-1-203, that the PSA was not a true lease but was a disguised secured sale agreement. Such a secured sale agreement would have required Sun State to file a UCC-1 financing statement to perfect its security interest in the gasoline pumps. It is undisputed that no such filing occurred. Sun State contends, however, that the PSA does not meet the criteria provided in § 7-1-203 to qualify as a secured sale agreement and that, therefore, the filing of a UCC-1 financing statement was not required to perfect its interest in the gasoline pumps as against a subsequent purchaser of the property.
Section 7-1-203 provides, in pertinent part:
"(a) Whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case.
"(b) A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:
"(1) The original term of the lease is equal to or greater than the remaining economic life of the goods;
"(2) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
"(3) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or
"(4) The lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.
"....
"(d) Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised.
"Additional consideration is not nominal if:
"(1) When the option to renew the lease is granted to the lessee, the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed; or
"(2) When the option to become the owner of the goods is granted to the lessee, the price is stated to be the fair market value of the goods determined at the time the option is to be performed.
"(e) The 'remaining economic life of the goods' and 'reasonably predictable' fair market rent, fair market value, or cost of performing under the lease agreement must be determined with reference to the facts and circumstances at the time the transaction is entered into."
*842 We begin this portion of our analysis by observing that
"the interpretation of an unambiguous contract is a question of law. '[W]hen the terms of a contract are unambiguous, the construction of the contract and its legal effect become questions of law for the court, and when appropriate, may be decided by summary judgment.' Dill v. Blakeney, 568 So.2d 774, 777-78 (Ala. 1990). Therefore, whether an agreement is a lease or a secured sale agreement is a question of law when the decision is based upon construction of the agreement and not on extrinsic facts. See LMV Leasing, Inc. v. Conlin, 805 P.2d 189, 193 (Utah App. 1991)."
Sharer v. Creative Leasing, Inc., 612 So.2d 1191, 1193-94 (Ala. 1993). The parties dispute certain facts in this case, but those disputed facts do not bear on the interpretation of the PSA.
It is also important to note that, as a comment to § 7-1-203 explains,
"[p]rior to enactment of the rules now codified in this section, the 1978 Official Text of Section 1-201(37) provided that whether a lease was intended as security (i.e., a security interest disguised as a lease) was to be determined from the facts of each case; however, (a) the inclusion of an option to purchase did not itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee would become, or had the option to become, the owner of the property for no additional consideration, or for a nominal consideration, did make the lease one intended for security.
"Reference to the intent of the parties to create a lease or security interest led to unfortunate results. In discovering intent, courts relied upon factors that were thought to be more consistent with sales or loans than leases. Most of these criteria, however, were as applicable to true leases as to security interests."
Official Comment 2 to § 7-1-203, Ala. Code 1975.
Because of the confusion caused by the reference to the intent of the parties, the UCC was revised to "draw[ ] a sharper line between leases and security interests disguised as leases to create greater certainty in commercial transactions." Id. It sought to do this by devising "tests [that] focus on economics, not the intent of the parties." Id. See, e.g., Excel Auto & Truck Leasing, L.L.P. v. Alief Indep. Sch. Dist., 249 S.W.3d 46, 51 (Tex. App. 2007) ("This two-part test focuses on the economics of the transaction rather than the intent of the parties or the label of the document."); Fangio v. Vehifax Corp. (In re Ajax Integrated, LLC), 554 B.R. 568, 578 (Bankr. N.D. N.Y. 2016) ("The Bright Line Test looks to the substance of the transaction and not the parties' intent."). Consequently, the fact that the PSA uses lease terminology, which could be used to argue that Sun State and IMAS intended the PSA to be a lease, is not controlling. What matters are the economic realities of the transaction.
The test stated in § 7-1-203(b) provides the criteria for distinguishing between a true lease and a secured sale agreement.
"Subsection (b) of Ala. Code [1975,] § 7-1-203 [,] creates a 'bright line' test to determine 'when a transaction in the form of a lease creates a security interest as a matter of law based upon the terms of the transaction.' [ In re Warne, [No. 09-13941, April 4, 2011] (Bankr. D. Kan. 2011) [not selected for publication in B.R.].] If a security interest is not created per se under § 7-1-203(b), then the court must consider 'the "facts of each case" to determine if an economically *843 meaningful interest was reserved to the lessor at the end of the lease term.' [ Id. ]"
In re HB Logistics, LLC, 460 B.R. 291, 303 (Bankr. N.D. Ala. 2011) (applying Alabama law).
"In general, the essential distinction between a true lease and a conditional sale is that in a lease, the lessee never owns the property. Rather, the lease grants the lessee the right to use property for a period less than its economic life with the concomitant obligation to return the property to the lessor while it retains some substantial economic life. At the end of the lease term, the lessor has the absolute right to retake and use the property.
"Where the purported lease is really a conditional sale agreement, the lessor holds only a security interest in the goods and has no other rights in the goods. Thus, where a transaction in the form of a lease creates a security interest, the lessor would not reasonably expect to receive back anything of value at the end of the lease since by that time, the goods would have reached the end of their economic life or the lessee would be compelled, contractually or economically, to purchase the goods or renew the lease to the end of the economic life of the goods.
"....
"The Code contains a two-part analysis, often referred to as the 'bright-line test,' for determining whether a lease is actually a disguised security arrangement. Under the first prong of that test, a lease transaction creates a security interest if the consideration that the lessee pays for the right to possess and use of the goods is an obligation for the term of the lease that is not subject to termination by the lessee. Thus, the focus is on whether a lessee has the right to terminate the consideration that he or she owes under the agreement, not whether the lessee may terminate the agreement itself.
"Under the second prong of the test, one of the four following conditions, referred to as 'residual value factors,' must also be true: the original term of the lease is equal to or greater than the remaining economic life of the goods; the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods; the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement. One determines the 'remaining economic life of the goods' based upon the facts and circumstances at the time when the parties enter into the transaction."
79 C.J.S. Secured Transactions § 23 (2017) (footnotes omitted and emphasis added).
In evaluating the first prong of the "bright-line test," Sun State focuses on whether IMAS had a right to terminate the agreement. Sun State expressly argues that "the plain language of Section 11(c) [of the PSA] clearly indicates that IMAS did indeed have the ability to terminate the PSA. The fact that Sun State had to consent to a termination by IMAS did not render the PSA 'not subject to termination.' " Sun State's brief, p. 22. As Pipkin points out, however, this argument is illogical. "Every contract can be terminated by mutual agreement, whether written into the contract or not. The issue is not whether Sun State could allow termination of the agreement, but whether IMAS had a true *844 right to terminate the agreement." Pipkin's reply brief, p. 16.
More importantly, as the wording of § 7-1-203(b) and the summary of this UCC provision quoted above indicate, though, the real test is not just whether IMAS had a right to terminate the PSA, but whether IMAS had a right to terminate the consideration to be paid under the PSA. Sun State contends that this is not the case "[b]ecause IMAS's obligation under the PSA ended before September 13, 20[2]0." Sun State's brief, p. 21. Sun State further explains:
"The term of the lease provision in the PSA was for a ten year period, which began on September 13, 2010. Less than two years later, however, in July 2012, IMAS stopped doing business with Sun State.... IMAS unilaterally ended its relationship with Sun State and currently has no obligation to purchase fuel from Sun State or to perform in any other manner under the PSA."
Sun State's brief, pp. 20-21.
There are several problems with this argument. First, this is not an accurate statement of the facts. IMAS did not "unilaterally end[ ] its relationship with Sun State"; about two years into the agreement IMAS informed Sun State that it was not making money operating the store on the property and that it was going to sell the property back to the Riverses. As Section 11(c) of the PSA makes clear, Sun State could have objected to IMAS's termination and could have required IMAS to pay the remainder of the consideration due under the PSA, but it chose not to do so.
More importantly, as Pipkin notes, Sun State is "argu[ing] that because IMAS breached the agreement, the lease is automatically a lease and not a security interest." Pipkin's reply brief, p. 14. In other words, Sun State argues that because IMAS did not pay the consideration remaining for the life of the agreement and because Sun State did not force IMAS to do so, IMAS had a right to terminate the consideration to be paid under the PSA. This does not follow. As Pipkin observes, what matters is whether the terms of the PSA meet the requirements of § 7-1-203(b), not whether the PSA was actually enforced as written. See id.
Section 11(e) of the PSA unequivocally states:
"In the event of the termination of this Agreement for any reason, [IMAS] shall additionally make payment in full of any amounts due from [IMAS] to [Sun State] pursuant to this Agreement, the equipment loan as described herein, the lost profits of [Sun State] as set forth herein, any unamortized equipment loan or lease payments, any damages or charges incurred by [IMAS] from Citgo or such other supplier as directed by [Sun State], and repayment in full of the rebates received by [IMAS], all of which amounts shall be then accelerated and immediately due and payable."
(Emphasis added.) The plain language of the PSA provides that IMAS did not have a right to discontinue the consideration it owed under the agreement. Therefore, the PSA satisfies the first prong of the test in § 7-1-203(b) for qualifying as a security interest.
Under the second prong of the test, the PSA must satisfy one of four listed conditions. Pipkin contends that the PSA satisfies the conditions listed in § 7-1-203(b)(1) and § 7-1-203(b)(4). As Sun State observes, however, Pipkin did not argue before the trial court that the condition listed in § 7-1-203(b)(1) had been satisfied. Therefore, we will not consider that argument *845 in this appeal.[4] See, e.g., Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala. 1992) (stating that "[t]his Court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court").
Section § 7-1-203(b)(4) provides that for a lease to qualify as a security interest "[t]he lessee [must have] an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement." Section 3(d) of the PSA unequivocally states: "Upon the successful completion of the requirements of this Agreement, [Sun State] shall transfer title to the loaned equipment to [IMAS] by Bill of Sale." Therefore, under the PSA, IMAS had the option of becoming the owner of the gasoline pumps for no additional consideration.
Sun State admits that "IMAS had the option to become the owner of the pumps upon successful completion of all of its obligations under the PSA." Sun State's brief, p. 24. But Sun State contends that the condition listed in § 7-1-203(b)(4) nevertheless "is irrelevant to the question whether the PSA created a security agreement as opposed to a lease" because "IMAS did not have an absolute obligation for the entire term of the PSA that was not subject to termination." Id.
The fact that IMAS did not fulfill all of its obligations under the PSA does not render the PSA a lease rather than a security agreement. Again, this argument confuses how Sun State chose to treat IMAS when IMAS failed to meet its obligations under the PSA with the actual stated terms of the PSA. As we have already determined, IMAS did have an obligation to pay the full consideration, which obligation was not subject to termination. Further, the PSA clearly provided that IMAS would become the owner of the gasoline pumps without further consideration following the completion of the term of the agreement. Thus, the PSA satisfied both prongs of the bright-line test in § 7-1-203(b) for "[a] transaction in the form of a lease creat[ing] a security interest."
Moreover, the PSA all but expressly declares that it is not a true lease but rather a disguised security agreement given that section 3(d) of the PSA specifically provides that "a UCC-1 Financing Statement governing the loaned equipment" should be "fil[ed] with the Florida [sic] Secretary of State,"[5] a provision for which Sun State provides no explanation and that was completely ignored in the trial court's order.
*846 Section 7-9A-334, Ala. Code 1975, provides, in part:
"(a) Security interest in fixtures under this article. A security interest under this article may be created in goods that are fixtures or may continue in goods that become fixtures. A security interest does not exist under this article in ordinary building materials incorporated into an improvement on land.
"....
"(e) Priority of security interest in fixtures over interests in real property. A perfected security interest in fixtures has priority over a conflicting interest of an encumbrancer or owner of the real property if:
"(1) the debtor has an interest of record in the real property or is in possession of the real property and the security interest:
"(A) is perfected by a fixture filing before the interest of the encumbrancer or owner is of record; and
"(B) has priority over any conflicting interest of a predecessor in title of the encumbrancer or owner[.]
"...."
It is undisputed that no UCC-1 financing statement -- which would have protected Sun State's security interest in the gasoline pumps -- was filed before Pipkin purchased the property. Therefore, Sun State's unperfected security interest in the gasoline pumps did not have priority over Pipkin's ownership interest in the property, including the gasoline pumps affixed to the property. Accordingly, Pipkin acquired the gasoline pumps free and clear of Sun State's interest in them, and Sun State did not possess an ownership interest in the gasoline pumps when it had them removed from Pipkin's property.
IV. Conclusion
Based on the foregoing, we reverse the summary judgment in favor of Sun State, and we remand the cause for further proceedings.
REVERSED AND REMANDED.
Stuart, C.J., and Parker, Main, and Bryan, JJ., concur.

A Sun State representative, Richard E. Blow II, testified by deposition that he believed the reference to "the Florida Secretary of State" was a typographical error and it should have stated "the Alabama Secretary of State."

Some courts have held that third parties have the same right as the tenant to enter the property of the landlord in order to remove trade fixtures. See MOCO, Inc. v. Gaines, 484 So.2d 470 (Ala. Civ. App. 1985) ; Ilderton Oil Co. v. Riggs, 13 N.C. App. 547, 550, 186 S.E.2d 691, 693 (1972) ("The plaintiff in this case had the same right to remove the underground storage tank, pump and accessory equipment that CLC, the lessee would have had, had it owned them.").

The MOCO court's citation to Milford v. Tennessee River Pulp & Paper Co., 355 So.2d 687 (Ala. 1978), in support of the quoted legal proposition reinforces what the Court of Civil Appeals intended in referencing a "licensee." Milford concerned a plaintiff, Floyd Milford, who contended that he was a "licensee" on the property of the defendant, Tennessee River Pulp & Paper Company, and that therefore certain equipment he had left on the property after he ceased doing business on the property belonged to him as trade fixtures. This Court observed that Milford could not have been a licensee because "[h]e neither sought nor obtained permission to remain on the land." 355 So.2d at 690. The Court therefore concluded that Milford was a trespasser, and "[a]s a trespasser, one has no claim to fixtures attached to the realty of another." Id. Thus, the "licensee" referred to the occupier of the property, not a third-party with no possessory or ownership interest in the property.

Near the conclusion of his appellate brief, Pipkin argues that the trial court erred by failing to hold a separate hearing on Sun State's motion for a summary judgment because not holding a separate hearing prevented Pipkin from submitting a thorough response to the arguments Sun State asserted in its motion. Pipkin further contends that if such a hearing had been held, he would have presented an argument about the PSA satisfying the condition listed in § 7-1-203(b)(1). The argument is without merit. First, we have no record that Pipkin objected in the trial court to the failure to hold a separate hearing on Sun State's summary-judgment motion. Second, Pipkin admits that Sun State did not make any arguments in its summary-judgment motion that were not made in its response to his motion for a partial summary judgment, and he also admits that he was able to respond to all of Sun State's arguments in the hearing that was held on his motion. Third, the trial court had discretion to consolidate arguments from Pipkin's motion for a partial summary judgment and Sun State's motion for a summary judgment in one hearing, given that the two motions covered the same issues.

See note 1, supra.